Clover Splint Coal Company, Inc. v. Commissioner.
Clover Splint Coal Co. v. Commissioner
Docket No. 4790.
United States Tax Court
1946 Tax Ct. Memo LEXIS 47; 5 T.C.M. (CCH) 901; T.C.M. (RIA) 46252; October 29, 1946
*47 Petitioner held not entitled to a new election, in the taxable year, as to its basis for depletion by reason of the modification in that year of the lease under which its coal lands were held. Arthur S. Dayton, Esq., Room 1101 Security Bldg., Charleston, W. Va., for the petitioner. J. O. Kramer, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies for the calendar year 1940, as follows: Declared Value
Excess-
Income Tax
Excess-Profits Tax
Profits Tax
$11,498.39
$731.80
$6,563.21
The only question presented is whether the taxpayer is entitled to a new election for percentage depletion for that period of the year 1940 subsequent to December 11 by reason of certain changes then made in a lease of coal lands which it held on certain acreage in Kentucky. The facts were established by stipulation and by testimony and exhibits introduced at the hearing. We include the stipulation by reference in our findings of fact and such additional facts as are set out hereinafter are found upon that testimony and the exhibits. Findings of Fact Petitioner is a West Virginia *48 corporation. Its principal office is at Pittsburgh, Pennsylvania. Its returns for the period here involved were filed with the collector of internal revenue for the 23rd district of Pennsylvania at Pittsburgh. On February 26, 1927, the petitioner, as lessee, entered into a coal mining lease with the Harlan Splint Land Company covering certain coal lands in Harlan County, Kentucky, on Big Black Mountain on the Cumberland River. Underlying this leasehold were four veins of coal above water level known and recognized as merchantable. There was also a fifth vein, known as No. 10 Seam, whose merchantability was not fully determined. The highest of the five seams is known as High Splint Seam which occurred at an elevation of 2,894 feet. Seventy five feet below this seam is Low Splint Seam. At a point 340 feet below Low Splint comes No. 10 Seam and at 834 and at 889 feet below are found C Seam and B Seam, respectively. On the 20th day of December, 1929, petitioner obtained a coal mining lease from the United States Coal and Coke Company with respect to certain coal adjoining the aforesaid lease from Harlan Splint Land Company and covering only the extension of the High Splint vein under *49 the additional lands leased. It was the desire of petitioner to lease from United States Coal and Coke Company all of the five veins under their tract, but the lessor would only agree to the leasing of the High Splint vein. Under its lease from Harlan Splint Land Company, petitioner was obligated to mine all merchantable coal from the leased lands and to pay a minimum royalty. The royalty provided with respect to the coal from the High Splint vein was 15.82 cents per ton and from the lower veins, 10 cents per ton. Upon acquiring the lease from the Harlan Splint Land Company, petitioner built a line of railroad from the level of the Cumberland River to connect with the Louisville-Nashville Railroad and at the foot of the mountain on this railroad it constructed its tipple and loading chutes. An incline was built up the mountain to the High Splint vein. This incline passed over the other four lower veins heretofore described, the tipple being practically on a level with the lowest of these veins. Upon constructing these facilities petitioner began and has continuously continued mining operations and the removal of coal from the High Splint vein. At no time prior to the close of *50 the year 1940 were any mining operations carried on with respect to the other four veins. Upon the filing of its "first return" of income from its mining operations, which was for the year 1934, petitioner made no election to take percentage depletion. It had no net income for that year. For the year 1936, when petitioner first had a net income, it claimed the right of election to take depletion upon a percentage basis, which right was denied by the Commissioner. On proceeding here, we approved the action of the Commissioner and our decision was affirmed, Clover Splint Coal Co. v. Commissioner, 130 Fed. (2d) 52. Subsequently the right of petitioner to take percentage depletion for the years 1938 and 1939 was before us and such right was denied. Our action there was also affirmed, Clover Splint Coal Co. v. Commissioner, 143 Fed. (2d) 108. Upon its organization petitioner issued a prospectus as an incident to the marketing of its stock. Detail was there set out as to the coal content of the High Splint vein. The computation of anticipated earnings was there based wholly upon the operation of this vein. The only reference in this prospectus to the four other *51 underlying veins of coal was the statement that the property contained four other veins which were included in the lease on a royalty of 10 cents per ton and that the mining of these was contemplated during the term of the lease which was for 50 years. Upon the beginning of its mining operations the petitioner executed under oath, on December 9, 1929, and filed with respondent "Form E-Schedule For Valuation of Coal Properties - To Determine Capital Invested in Coal, Depletion and Profit or Loss from Sale of Capital Assets." This form required a statement as to the property operated, the royalty rate paid per ton, the name of the property, the thickness and acreage of the seams and the total tonnage recoverable. The computation of the total tonnage appearing on this form, executed by petitioner, was limited to that from High Splint vein. The name of the property was there given as High Splint vein, and the royalty as 15.82 cents per net ton. No mention was made of any other coal deposit on the leased property. The location of petitioner's tipple and other facilities at the foot of the mountain made it possible to operate all of the five seams of coal heretofore mentioned with these *52 same facilities. Although petitioner at all times prior to the close of the calendar year here involved confined its operations to the removal of coal from the High Splint vein, such action was consistent with good mining judgment since the removal of an upper vein first before mining the lower relieves the operation from the danger of subsidence of the coal in the upper vein into the workings of the vein below. Moreover here, another objection to the mining of the coal in the lower veins while the upper vein was being worked was that the High Splint vein was a higher grade coal than that in the lower veins and commanded a different market. In operating the lower veins containing lower grade coal with the upper vein containing better grade coal it would have been difficult to keep the coal from intermingling when handled through the same tipple and facilities. In the year 1940, petitioner entered into negotiations with its lessor, the Harlan Splint Land Company, for the release to the lessor of certain parts of its holdings in the leasehold so that the released portion could be leased to the Clover Darby Coal Company, a corporation not affiliated in any manner with petitioner. As *53 a result of these negotiations petitioner, on December 11, 1940, entered into a new lease with the Harlan Splint Land Company, under which there was leased to petitioner by the Harlan Splint Land Company only the High Splint and Low Splint veins. On the same date these parties entered into a supplementary contract binding the Harlan Splint Land Company, in leasing any of the seams of coal thus released to it, to require its lessee to leave sufficient coal in its mining operations to support the overlying strata. In addition to the release by petitioner of the three lower veins of coal, the new lease differed from the old in other respects. Under the old lease petitioner had exclusive possession and control of all of the surface boundary including timber rights, whereas under the new lease its surface rights were limited to the surface above the outcrop of Low Splint coal, plant surface and a strip underneath the conveyor or incline from the top of the mountain down to the railroad. The new lease gave dumpage and water drainage rights below the Low Splint outcrop and reserved corresponding rights for the lessee of the lower veins. There was no change in the two leases as to unit tonnage *54 rate, but the minimum rental in the old lease of $30,000 per year was reduced to $24,000 for the year 1942, $18,000 for 1943 and thereafter to be further reduced to $15,000 under certain contingencies. Under the old lease petitioner was to pay all the property taxes upon the boundary. Under the new lease it is to pay only one-half thereof. The old lease provided that the minimum royalty of $30,000 should be reduced to $15,000 when the aggregate minimum royalties paid should equal the tonnage royalty calculated upon all the mineable coal embraced in the leasehold, whether actually mined or not, there being no provision for free mining, the maximum at the lower figure continuing in effect. The new lease provides that when the aggregate minimum rentals and the aggregate tonnage royalty shall have equaled the tonnage royalty calculated upon all of the commercially merchantable coal contained in the splint seams of the leasehold, thereafter the lessee shall be entitled to mine and remove all of the commercially merchantable coal in such seams without any further payment of tonnage royalty and without any minimum rental except that during the period of such mining the lessee shall pay to *55 the lessor a rental of $2,000 a year, which shall entitle the lessee to the use and possession of the leased premises to the same extent as though tonnage royalty were payable. Opinion That petitioner is not entitled to take depletion upon percentage basis for years prior to 1940 has been definitely adjudicated in the proceedings noted in our findings, it having failed to elect such basis for depletion in its first return following the start of its operations. The present deficiency arises from respondent's disallowance of depletion taken by petitioner upon a percentage basis for the calendar year 1940. Petitioner concedes that it was in error in taking depletion for that portion of 1940 prior to December 11, but contends that by reason of certain changes and modifications on that date of the lease under which it held its coal lands thereafter it held a new "property" and that this gives it the right to a new election. The parties are not in dispute as to the law and agree that the regulations of respondent construing the word "property" as used in sections 23 (m) and 114, I.R.C., are correct and binding. In Regulations 94, article 23 (m)-1, appear the *56 following definitions: (b) A "mineral property" is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. * * *
(j) "The property," as used in section 114 (b)(2), (3) and (4) and articles 23(m)-1 to 23(m)-19, inclusive, means the interest owned by the taxpayer, freehold or leasehold, in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed. The corresponding articles of Regulations 101, 103 and 111 contain substantially the same definitions and these have been approved and applied by the courts. Helvering v. Jewel Mining Co., 126 Fed. (2d) 1011; Black Mountain Corp., 5 T.C. 1117. Here, petitioner has leased a tract of land underneath which lie five separate and distinct coal deposits. Under the quoted regulation, each one of these deposits constitutes *57 a separate property for the purpose of computing depletion except that if these deposits may be operated by one plant they may be considered as "one property", if the taxpayer has consistently so treated them. Section 23 (m), I.R.C., provides for a reasonable allowance for depletion to be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary of the Treasury. Petitioner does not dispute the fact that to be permitted the contested allowance it must bring itself within the provisions of those regulations. Two contentions are made. The first is that it has consistently treated all of the five coal deposits on the leased tract as "one property". If it be sustained in this contention it would necessarily follow that when it released to its lessor the three underlying veins, a separation of the property would have been effected and the two veins or deposits retained under lease would constitute a new "property" with respect to which the petitioner would then have a new right of election as to the basis for depletion. G.C.M. 22106, C.B. 1941-1, p. 245. Petitioner's second contention is that the terms of *58 the new lease, by virtue of which it holds the two upper deposits, so changed the conditions with respect to those deposits and the rights it held in relation to them that its interest therein was so different in character as to constitute a new "property" thus giving it a right to a new election. To sustain petitioner upon its first contention it would be necessary that petitioner establish that it has in fact consistently treated the five coal deposits in question as one property. This, petitioner argues, has been done. It points to the fact that all of these deposits were acquired in one lease and that its mining plant was located and laid out in such manner that all five seams could be mined successively with this same plant. It argues further that the fact that prior to the close of the taxable year 1940 it had confined its mining operations to the High Splint vein does not negative its contention that all five veins were treated as one property, since the mining first of the higher vein is the approved practice. We agree with petitioner that it has established the fact that mining an upper vein before a lower underlying seam is good mining practice. Likewise it is clear that *59 such procedure does not indicate affirmatively that this upper vein was being treated as a property separate from the lower veins. But the fact that the tipple, loading tracks and chutes were located on the railroad at the foot of the mountain at a point where they could be later used in the mining of the four lower veins does not, we think, materially assist petitioner. There is nothing to indicate that anything was done in respect of location and construction of the plant that would not have been necessary for the mining of the High Splint vein alone. Consequently, there is nothing very weighty in this evidence tending to establish the fact that petitioner was treating these five separate coal deposits as one property. Shortly after beginning operations petitioner executed under the oath of one of its executive officers, and filed with respondent, Form E, which is a required statement giving the name of the coal property operated, its description including the acreage and thickness of the vein or veins, the estimated coal content, the royalty per ton if held under lease, and other technical data. In this form, as executed by petitioner, no mention whatever was made of the coal *60 deposits in the four lower veins. The property was described, however, as consisting of a vein known as High Splint, the coal content reported was that from this single vein, and the only royalty stated was that upon the coal from High Splint. Respondent points to these facts as more than meeting any record support for the contention of petitioner that the five seams were consistently treated as one property. Petitioner's explanation is that the form in question was executed without consultation with legal counsel and that its significance was not understood. It may well be that petitioner failed to understand the possible effect of its treatment of High Splint on this basic report as a separate property. The fact remains, however, that it was so treated. We can not but agree that petitioner, in this report to be used as a basis for computation of depletion, definitely treated the High Splint vein as a separate "property" and that having so done we can not hold that it has consistently treated the five deposits as one "property". Petitioner's first contention falls. In support of its second position, petitioner argues that under the terms of the new lease the surface area embraced *61 in the former lease covering all of the five coal deposits was substantially reduced. But, in this connection, it is noted that under the new lease petitioner retained all the surface necessary in the operation of the High and Low Splint veins. The surface rights released appear to have been those necessary to the mining of the three lower veins. No property change with respect to the High and Low Splint veins was thus brought about. Under the terms of the old lease royalty was due and payable upon all coal mined and upon the exhausting of the estimated coal content of the vein if a residue remained it was obligated to mine this and to pay royalty upon each ton so mined. The new lease changed this condition by the provision that when the aggregate minimum rentals and the aggregate tonnage royalty paid should equal the tonnage royalty calculated upon all of the commercially merchantable coal as estimated could be produced, in that event if there remained coal not yet mined the petitioner was entitled to mine it without payment of royalty but merely with the obligation to pay $2,000 a year, in the nature of rental of land. Because of this change, petitioner argues that in its payment *62 of minimum royalties and per ton royalties it was actually purchasing property represented by the excess coal in the vein over and above the estimated coal content. Upon this premise it is urged that the property right possessed under the new lease was distinctly different from that under the old and that it must be concluded that petitioner thereafter possessed a new "property" different from that held under the original lease. We are not impressed with this argument. It may be that at some future time petitioner may, under the terms of the lease, become possessed of a property interest which it does not now possess, but such change was not effected by the lease and does not now exist. Whether there will be an excess of coal in High and Low Splint over and above the estimated content is a matter which only the future will reveal. We do not think that this provision in the lease effected such a change that petitioner is now possessed of "property" in High and Low Splint different from that it possessed under the original lease. As to whether petitioner, if, by reason of royalty payments in the future, it then becomes possessed of a fee in coal deposits over and above the estimated *63 reserve, will have acquired a new property by such change and thus be entitled to a new election, we do not now decide. We hold that petitioner did not become entitled to a new election as to its basis for depletion by reason of the changes in its lease effected by the transactions of December 11, 1940. Decision will be entered for the respondent.